# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| KYLE C. KERBAWY, SR., | ) | |
| Plaintiff/Counterclaim-Defendant, | ) | |
| v. | ) | C.A. No. 10769-VCP |
| JOHN MCDONNELL, MAGNUS MOLITEUS, MARTIN PFINSGRAFF, JAMES D'ORTA, STEVEN P. MULLINS, and JON T. TREMMEL, | ) | |
| Defendants/Counterclaim-Plaintiffs. | ) | |
| JOHN MCDONNELL, MAGNUS MOLITEUS, MARTIN PFINSGRAFF, JAMES D'ORTA, STEVEN P. MULLINS, and JON T. TREMMEL, | ) | |
| Third-Party Plaintiffs, | ) | |
| v. | ) | |
| JAMES DEFRANCESCO, | ) | |
| Third-Party Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: June 18, 2015
Date Decided: August 18, 2015

Eric D. Selden, Esq., David E. Ross, Esq., Nicholas D. Mozal, Esq., ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; *Attorneys for Plaintiff/Counterclaim Defendant.*

Kevin R. Shannon, Esq., Matthew F. Davis, Esq., Jaclyn C. Levy, Esq., Matthew A. Golden, Esq., POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorneys for Third-Party Defendant.*

Kenneth J. Nachbar, Esq., Leslie A. Polizoti, Esq., John P. DiTomo, Esq., Matthew R. Clark, Esq., Christopher P. Quinn, Esq., Jason Tyler, Esq., Zi-Xiang Shen, Esq., Thomas P. Will, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Defendants/Counterclaim-Plaintiffs/Third-Party Plaintiffs.*

Rudolf Koch, Esq., Susan M. Hannigan, Esq., Sarah A. Clark, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Intervenor ACell, Inc.*

**PARSONS, Vice Chancellor.**

In this action under 8 *Del. C.* § 225, I am asked to determine whether written consents delivered by the holders of a majority of a company's stock should be set aside on equitable grounds. The plaintiff, a stockholder who solicited the consents, was assisted in his endeavor by a sitting director who controls about twenty-four percent of the company's stock, and a former officer. The defendant incumbent board of directors of this privately held company was tipped off that a consent solicitation was underway. The defendant directors immediately went into a forceful defensive effort that ultimately was unsuccessful. The plaintiff stockholder delivered consents purporting to represent about 53% of the outstanding stock.

The incumbent directors refused to recognize the consents as valid or effective. The plaintiff then commenced this action seeking a declaratory judgment that his new director nominees, including himself, were validly elected as the company's board. The incumbent directors counterclaimed against the plaintiff and brought third-party claims against the director-stockholder who assisted in the solicitation. In support of those claims, and in defense against the plaintiff's assertion that his new board validly was elected, the incumbent directors contend that the consent solicitation was tainted by inequitable conduct and must be set aside. In particular, the incumbent directors: (1) challenge certain disclosures that the plaintiff made to other stockholders as materially misleading; (2) allege that the plaintiff and third-party defendant tortiously interfered with the former officer's separation agreement, which barred him from assisting any consent solicitation; and (3) allege that the third-party defendant improperly provided company information to the plaintiff in connection with the solicitation effort.

1

I presided over a two-day trial. This memorandum opinion contains my post-trial findings of fact and conclusions of law as to the plaintiff's Section 225 claim and the various counterclaims and third-party claims that conceivably might affect that claim. For the reasons stated herein, I conclude that none of the grounds advanced by the defendant directors provides a sufficient justification for me to set aside the stockholders' consents. Thus, the plaintiff and the other members of his new board slate validly were elected as the company's directors, and he is entitled to the declaratory relief he seeks.

## I. BACKGROUND[1]

### A. Parties

Non-party ACell, Inc. ("ACell" or the "Company") is a Delaware corporation headquartered in Maryland. It was founded in 1999 and remains privately held, with roughly 150 stockholders. Together with family members and affiliated entities, Plaintiff Kyle C. Kerbawy, Sr. has invested over $1.1 million in ACell and holds about five percent of the Company's outstanding stock.[2]

Third-party Defendant James R. DeFrancesco began working at ACell in 2002. Since that time, DeFrancesco has been a member of ACell's board of directors; until October 2014, he also was the Company's CEO. His investment in the Company exceeds $3 million, and together with family members he controls about twenty-four percent of

---

[1]   Few of the facts in this case are disputed. To the extent any facts are in dispute, I have used a preponderance of the evidence standard to make the findings contained herein. Citations to the trial transcript are in the form "Tr. # (X)," with the testifying witness "X" identified if not apparent from the text.

[2]   Tr. 11-12, 64 (Kerbawy); JX 714.

2

ACell's stock, making him its largest stockholder.[3]  For purposes of this case, Kerbawy and DeFrancesco are aligned with non-party Rodney Bosley, who was the Company's COO until he was terminated at the same time as DeFrancesco in October 2014.  Bosley owns about three percent of ACell's stock.

Kerbawy brought this action against six of the Company's seven incumbent directors: Dr. James D'Orta, John J. McDonnell, Jr., Magnus Moliteus, Steven P. Mullins, Martin Pfinsgraff, and Jon Tremmel ("Defendants," or the "Board").  McDonnell, the Chairman of the Board, is one of ACell's largest stockholders, owning over six percent of the Company's stock.[4]  D'Orta became CEO in late 2014, after DeFrancesco's removal.

Non-parties David Anderson, Louis "Skip" Baldino, James Osborne, and Claude Pering (collectively the "Director Nominees," and together with Kerbawy, the "New Board") are the individuals Kerbawy seeks to have seated on ACell's board of directors.

### B.  Facts

#### 1.  The DOJ Investigation dashes ACell's hopes for an IPO

ACell develops, manufactures, and markets regenerative medical products.  After years of growth, the Company began realizing profits in 2012, and during 2013 it made preparations for an initial public offering ("IPO").  The board of directors, which had included only DeFrancesco, McDonnell, Pfinsgraff, and Moliteus, was expanded with the addition of Mullins, a former public company CFO, and D'Orta and Tremmel, who had

---

[3]     Tr. 266 (DeFrancesco).

[4]     JX 714.

3

experience in the medical device industry.[5]   On January 31, 2014, the Company submitted a preliminary registration statement (the "Draft S-1") for review by the U.S. Securities and Exchange Commission (the "SEC").  ACell's lead underwriter indicated a value for the Company in the $400 to $500 million range.[6]

The Company's prospects took a blow in February 2014 when the Board was informed that the U.S. Department of Justice ("DOJ") had served a subpoena requesting information about ACell's regulatory compliance, including alleged improper marketing of ACell's products for non-approved or "off-label" uses (the "DOJ Investigation").  The DOJ Investigation had two major consequences.  First, it derailed the IPO, which fell apart when the Company's underwriters could not formulate a satisfactory risk factor for inclusion in the registration statement.[7]   Later in 2014, when the Board and its bankers canvassed over thirty potential buyers regarding interest in a private transaction, ACell received bids in the $250 million range.[8]   Even those significantly reduced numbers were contingent on further developments with the DOJ Investigation, and no serious offers materialized.

The second consequence of the DOJ Investigation was that it divided DeFrancesco and Bosley from the other members of the Board.  As discussed in more detail *infra*, the ongoing dispute over the DOJ Investigation—who was to blame for its occurrence, what

---

[5]      JX 700.

[6]      Tr. 143 (Pfinsgraff).

[7]      *E.g.*, Tr. 460 (McDonnell).

[8]      Tr. 143-44 (Pfinsgraff).

4

the Company's strategy should be in light of it, and its impact on the validity of the consent solicitation at issue here—colors nearly every aspect of this case.

After receiving the DOJ subpoena, the Board made changes to the Company's compliance procedures, some of which already had been under consideration in preparation for the IPO.[9] Instead of having compliance report to Bosley, then COO, Pfinsgraff, Tremmel, and others on the Board wanted to have compliance report through the legal department and directly to a compliance committee of the Board, which was chaired by D'Orta.[10] DeFrancesco and Bosley unsuccessfully resisted such a change. By mid- to late-summer of 2014, the escalating tension resulted in arguments between DeFrancesco and Bosley, on one hand, and D'Orta and Miles Grody, ACell's in-house counsel, on the other hand, which required the Board to intervene regularly in day-to-day management issues.[11]

ACell responded to the DOJ Investigation by hiring Williams & Connolly LLP. After a preliminary internal investigation, Williams & Connolly made an initial presentation to the Board in April 2014. A consensus emerged among the board members that DeFrancesco and Bosley needed to be terminated.[12] CEO McDonnell, however, persuaded the Board to wait for a more thorough investigation to conclude, and to continue efforts to sell the Company in the meantime. According to DeFrancesco, the

---

[9] *Id.* at 134-38.

[10] *Id.*

[11] *Id.*

[12] *Id.* at 464-66 (McDonnell).

Board misleadingly reassured him and Bosley, but in reality was planning to offer them up as scapegoats.[13] Defendants asserted that DeFrancesco "was incensed that Williams & Connolly would implicate him and Bosley in potential wrongdoing, and his immediate reaction was to fight."[14] I do not consider it relevant to any material issue in this case, however, to decide which of those characterizations is more accurate, because DeFrancesco and Bosley were never involved in managing the DOJ Investigation.[15] In any event, DeFrancesco and Bosley's disagreements with D'Orta and Grody continued to mount as the summer progressed.

The DOJ Investigation was not a subject confined to the boardroom. Stockholders were advised of the Investigation in May 2014 at the annual stockholders' meeting, which, for ACell, apparently involved actual in-person attendance by a number of its 150 or so stockholders.[16]

### 2. DeFrancesco and Bosley unsuccessfully try to remove the board

In September 2014, the DOJ became "very upset" at the level of cooperation it was receiving from ACell.[17] For McDonnell, that was a turning point. The Board "decided that we had to get the DOJ behind us."[18] The Company's first in-person

---

[13] *E.g.*, DeFrancesco Opening Br. 10-16; Tr. 316-18.

[14] Defs.' Opening Br. 12.

[15] Tr. 229-30 (Pfinsgraff).

[16] *E.g.*, JX 15; Tr. 174-79 (Pfinsgraff); *id.* at 273-74 (DeFrancesco).

[17] Tr. 473 (McDonnell).

[18] *Id.* at 474.

6

meeting with the DOJ was scheduled for late October. On October 15, a week before that meeting, the Board met and voted, over DeFrancesco's objection, to request that DeFrancesco and Bosley resign before October 20 or be terminated for cause.[19] The Board also voted to appoint D'Orta as interim CEO.

Rather than go quietly, DeFrancesco and Bosley emailed a group of ACell stockholders on October 19, and asked them to execute written consents removing the Defendants (the "DeFrancesco Solicitation").[20] McDonnell responded immediately with an email of his own, stating that DeFrancesco and Bosley's email "contain[ed] a number of errors and material misstatements and omissions," and that the Board had been "presented with evidence that caused it to believe that there was a reasonable—if not a strong—basis to conclude that Jim [DeFrancesco] and Rodney [Bosley] may have violated certain federal criminal statutes."[21] Once the Board learned of the DeFrancesco Solicitation, the offer for DeFrancesco and Bosley to resign was revoked and they each

---

[19] *Id.* at 478-81; JX 42; JX 707. DeFrancesco suggests the Board's action in this regard was in violation of ACell's charter and bylaws, because the decision to terminate an executive was not one that a Board committee could make, and because DeFrancesco was excluded from the meetings and discussions in mid-October that led to his termination. DeFrancesco Opening Br. 12-16. I do not consider that issue relevant to the question of whether the New Board was validly elected, which is the Court's inquiry in this action.

[20] JX 37.

[21] JX 42. On October 17, two days after the Board meeting, DeFrancesco met with McDonnell and D'Orta. While some aspects of what was said at that meeting are disputed, McDonnell admits telling DeFrancesco that he thought DeFrancesco had done nothing wrong in connection with the DOJ Investigation. Tr. 480 (McDonnell).

7

were terminated "for cause."[22] DeFrancesco and Bosley then halted their solicitation effort, but not before receiving written consents from the holders of 49.6% of ACell's common stock.[23]

One supporter of DeFrancesco and Bosley was Kerbawy. Defendants emphasize that Kerbawy, a former distributor of ACell's products, believed as of October 2014 that the Board's approach to the DOJ Investigation was "stupidity" and "tantamount to admitting guilt."[24] As discussed in more detail *infra*, Defendants believe that DeFrancesco and Bosley found a sympathetic ear in Kerbawy in part because Kerbawy feared the DOJ Investigation potentially could sweep wide enough to bring distributors like him under scrutiny. Kerbawy testified, however, that he supported DeFrancesco and Bosley because they had been good leaders of the Company and he thought it was wrong to fire them.[25] In any event, Kerbawy actively supported the DeFrancesco Solicitation by, for example, editing messages for DeFrancesco before he sent them out.[26] But, after it became clear DeFrancesco and Bosley would not prevail, Kerbawy believed they needed to stand down and give the Board time to resolve the DOJ Investigation and get

---

[22]    Tr. 150 (Pfinsgraff).

[23]    *Id*. at 65 (Kerbawy).

[24]    JX 31.

[25]    Tr. 14-15.

[26]    JX 33, 40.

8

the business back on track. He advised another stockholder to that effect on November 1 or 2, 2014.[27]

The Company offered both DeFrancesco and Bosley separation agreements.[28] DeFrancesco did not execute such an agreement, but Bosley did (the "Separation Agreement").[29] Pursuant to that Agreement, Bosley retained the right to exercise his outstanding stock options, which were numerous, and ACell agreed to forego any clawback of either the options or Bosley's issued and outstanding shares. In exchange, Bosley accepted a "Standstill Provision" barring him from directly or indirectly soliciting consents, or directly or indirectly becoming a "participant" in such a solicitation, or assisting any other person in such a solicitation.[30] The Separation Agreement also contained a "Confidentiality Provision" forbidding Bosley from misusing the Company's confidential information.[31]

Although McDonnell and the Board reached a détente with DeFrancesco and Bosley, it was clear that "two camps" remained, with each thinking the other was harming the Company.[32] Anne Graham, another significant stockholder, said she felt "[misled] by the board" and was "in a state of shock" due to DeFrancesco and Bosley's

---

[27]    JX 125.

[28]    JX 92 (DeFrancesco's draft agreement)

[29]    JX 149 (the Separation Agreement).

[30]    Separation Agreement § 4.

[31]    *Id.* § 5. As discussed *infra*, Bosley later breached both of those provisions.

[32]    JX 158.

9

removal.[33]  In addition, at least some stockholders who had not supported the October 2014 consent solicitation, such as Joanne Watson, the widow of ACell's founder, nevertheless were "seriously thinking of continuing to make some changes in the board."[34]

### 3. Kerbawy prepares for a new consent solicitation

#### a. Kerbawy decides to replace the Board

Through November 2014, Kerbawy was having daily conversations with other ACell stockholders, and "hearing wildly divergent things about what was going on at the company," but he "had no idea who was right."[35]  With "little formal info coming out of the company,"[36] Kerbawy demanded books and records under 8 *Del. C.* § 220, on the advice of his son-in-law, Jon Steiger, an attorney who also owns ACell stock.  In early January 2015, Kerbawy reached out directly to McDonnell for help in this regard, and McDonnell appeared to agree that Kerbawy should get the requested information without any "legal BS."[37]

---

[33]  JX 127.

[34]  Tr. 651 (Watson).

[35]  *Id.* at 17-18 (Kerbawy).

[36]  JX 158.

[37]  JX 183.  Kerbawy received ACell's capitalization table and contact information for stockholders on February 9, 2015.  JX 276.

Kerbawy testified that he was troubled by departures of key employees and low morale at the Company during January 2015.[38] McDonnell emailed Kerbawy on January 16 to share bad news from a series of strategic meetings at which McDonnell and others were trying to gauge interest in a possible sale of ACell. When McDonnell indicated that "no one was viewing ACell as a Strategic Acquisition," Kerbawy decided it was time to change the Company's management.[39] He was even more upset to learn a week later that the Board had decided to make D'Orta the permanent CEO without conducting a search process. Thus, Kerbawy determined that changes were needed as soon as possible. Other stockholders with whom he had been talking agreed. For example, Watson told Kerbawy that she would support a change if it involved a "clean slate" of all new directors.[40]

Kerbawy prepared for a new solicitation of written consents (the "Kerbawy Solicitation") by reaching out to "everyone [he] could think of" who was knowledgeable about ACell and the medical device manufacturing industry, including DeFrancesco, Bosley, an ACell sales executive named Tres Riley, and others.[41] Kerbawy also relied heavily on the assistance of his son-in-law Steiger, and together they formed a "Project Timeline" for running a successful solicitation.[42]

---

[38]     Tr. 24-26.

[39]     JX 199.

[40]     Watson Dep. 55.

[41]     Tr. 20-28.

[42]     JX 310.

11

### b. Bosley and DeFrancesco participate

The contemporaneous documents demonstrate that both DeFrancesco and Bosley participated in, or at least substantially assisted with, the Kerbawy Solicitation. On January 14, 2015, DeFrancesco sent a text message to Kerbawy and Steiger, forwarding contact information for his attorney, Brett Antonides, and stating that Antonides is "more than willing to[] assist and work with us in the proper manner."[43] Kerbawy, Steiger, DeFrancesco, and Antonides communicated regularly via text, email, and phone during February and March 2015.[44] Kerbawy shared his and Steiger's Project Timeline with DeFrancesco on February 18, and encouraged him to "review and share as appropriate."[45]

One particular way DeFrancesco provided assistance was to help Kerbawy analyze the stockholder base and estimate the percentage of shares likely to be in favor of the Kerbawy Solicitation. On February 2, DeFrancesco sent a detailed analysis in that regard to Kerbawy, Antonides, and Steiger, and the four apparently set up a phone call to discuss it.[46] In that vein, DeFrancesco also enlisted employees of ACell still loyal to him to determine the level of support Kerbawy could expect from employee-stockholders.[47]

---

[43]     JX 193.

[44]     *E.g.*, JX 307.

[45]     JX 310.

[46]     JX 568, 247, 248, 253.

[47]     JX 228.

DeFrancesco also helped with director nominee recruitment by, for example, speaking with potential candidates Baldino and Anderson at length on the phone.[48]

Based on the evidence, I found Bosley's assistance to be more limited than DeFrancesco's. He mainly focused on helping Kerbawy identify strong candidates for his new director slate. For example, Bosley and Kerbawy conferred by email on February 4 about Baldino, and also about what the compensation package should be for independent directors.[49] Bosley also corresponded with Anderson about his interest in joining ACell's Board.[50] Similarly, Bosley forwarded resumes and bios for several other candidates that Kerbawy ultimately did not include on his slate.[51]

### c.  Kerbawy utilizes inside information

The evidence showed that DeFrancesco and Bosley provided Kerbawy with some internal ACell documents for use in helping recruit the Director Nominees and otherwise furthering the Kerbawy Solicitation. To that end, DeFrancesco used Antonides as a go-between for exchanging documents with Kerbawy and others.[52] On January 21, Steiger wrote to Kerbawy that Antonides "sent me a large packet of corporate documents I have

---

[48]  JX 177, 294.

[49]  JX 255.

[50]  JX 222.

[51]  JX 256, 272.

[52]  For example, on February 19, Kerbawy asked Steiger to "send my timeline to Brett [Antonides] as Jim [DeFrancesco] will ask him for it. JX 191. *See also* JX 249 (email from DeFrancesco to Antonides dated February 20, 2015, forwarding a September 2014 email from Grody that has as an attachment a generic "Senior Executive Employment Agreement").

been reviewing."[53] DeFrancesco himself sent Kerbawy a Company stock ledger effective as of June 2014,[54] and a series of documents relating to ACell's director and officer insurance policies.[55] On February 11, 2015, he also sent Kerbawy a strategic planning document that D'Orta and senior management had circulated to the Board (including DeFrancesco) in anticipation of an upcoming Board meeting.[56] Kerbawy forwarded the D&O policy documents to at least Anderson and Baldino, neither of whom worked for ACell.[57] Indeed, DeFrancesco apparently sent "an entire series of documents" to Kerbawy via FedEx with the intention that Kerbawy would relay them to Baldino.[58] On February 18, Kerbawy also sent to the Director Nominees the Draft S-1 from the failed IPO effort in 2014.[59]

Bosley provided substantially less information to Kerbawy, but it seems that he did provide at least some information, including minutes from ACell board meetings.[60]

---

[53] JX 191.

[54] JX 209.

[55] JX 305.

[56] JX 286.

[57] JX 306, 312.

[58] JX 313, 317.

[59] JX 308, 309.

[60] JX 191. In one message dated January 22, 2015, Kerbawy wrote that he had talked to Bosley, apparently about ACell board resolutions of some kind, and Bosley said that certain of them "definitely did not pass," but that Bosley would send Steiger the meeting minutes. *Id*. On February 6, Kerbawy asked whether Steiger had received anything from Bosley about a potential director nominee that

14

In total, the evidence supports a finding that through DeFrancesco (and to a lesser extent, Bosley), Kerbawy had access to: (1) ACell's bylaws; (2) a Company stock ledger; (3) the Company's D&O policies and related documents; (3) the Draft S-1; (4) unidentified meeting minutes from ACell Board meetings; and (5) a Company strategic planning document. Kerbawy also had the charter, which is a public document in any event.[61] The record further shows, and Defendants do not dispute, that Kerbawy used that information to inform his Director Nominees about the Company and otherwise bolster his plan to solicit consents to remove the Board.

### d.  Kerbawy finalizes his plan

One set of issues that the parties vigorously dispute is whether, and to what extent, Kerbawy's plan for ACell included returning DeFrancesco and Bosley to their director or officer positions. Defendants assert that Kerbawy had a concrete plan to restore Bosley as a high-level consultant, and insinuate that Kerbawy and the New Board might appoint DeFrancesco to a vacant Board seat.[62] This contention fits within Defendants' narrative that Kerbawy dishonestly advertised that he was proposing a "fresh start" with an independent board, but in fact planned to return ACell to DeFrancesco and Bosley's control and force the Company to "fight the DOJ." Based on all the evidence, I find that Kerbawy did expect Bosley to have a role as a consultant, but the evidence does not bear

---

Kerbawy was planning to speak with. *Id.* Steiger replied that he had forwarded everything in his email account from Bosley, but Kerbawy told him to "forget about [Bosley's] stuff," because "[h]e will send [it to me] this afternoon." *Id.*

[61]  JX 207.

[62]  *E.g.*, Defs.' Opening Br. 3-5, 23-25, 36-37; Defs.' Reply Br. 3-4, 10-12, 36-37.

15

out Defendants' assertions relating to DeFrancesco specifically, or the "fight the DOJ" narrative generally.

With regard to Bosley, I find that while he might have envisioned himself returning to the CEO post, Kerbawy's plan was for the New Board to consider bringing Bosley back, if at all, as an interim consultant. On February 11, 2015, Bosley emailed Kerbawy a draft announcement that is written as if it would be delivered to ACell employees after the New Board took control.[63] The draft describes the New Board's initial actions as if they had just occurred: *i.e.,* D'Orta "was removed from his position as CEO"; Miles Grody "was removed from his position as General Counsel"; Bosley "was hired as a consultant and will hold the position as Acting CEO"; Terry Hill "was reinstated as VP of Quality"; and Bill Knape "was reinstated as VP of Regulatory and Clinical Affairs."[64] In a March 2 email responding to Steiger's questions about who Kerbawy wanted to assist the new management, Kerbawy replied, among multiple thoughts, that he would have Bosley "at my shoulder."[65]

But those documents are undermined by other contemporaneous communications Kerbawy had. As early into his planning process as January 13, 2015, Kerbawy indicated that he planned to talk to DeFrancesco and Bosely to persuade them it would be "easier to

---

[63]     JX 289.

[64]     *Id.*

[65]     JX 331.

16

get vote [sic] on board proposing all new mgmt with them interim only."[66] Similarly, on February 28, Kerbawy sent a comprehensive email to his Director Nominees, to which he attached a "New Board Agenda" outlining some of the first steps he believed the New Board should take.[67] That document, rather than presenting any decisions regarding Bosley as a fait accompli, indicates that the New Board would engage in "discussion" of various items, including the "proposed" hiring of Bosley as a consultant.[68] And, with respect to the specific items relating to Compliance (*i.e.*, Grody) and reinstating Hill and Knape, at least several individuals were supposed to address and advise the Board, including D'Orta. Those facts, together with the undisputed fact that all of the Director Nominees are independent of both Kerbawy and DeFrancesco, lead me to conclude that, in crafting his New Board Agenda, Kerbawy envisioned actual discussion rather than "rubber stamp[ing]."[69]

---

[66] JX 191. Defendants highlight this statement of Kerbawy's as evidencing his intent to mislead the stockholders into thinking that DeFrancesco and Bosley were not really going to have a role with the New Board, when in fact they were. The weight of the evidence does not support that characterization. Rather, it seems that nearly two months before beginning to solicit consents, Kerbawy was formulating his plan and it included telling DeFrancesco and Bosley that his plan involved "all new" management, and that the only role they would have, if any, would be to assist in the interim. I find this to support, rather than undermine, Kerbawy's general narrative, which is that he intended to put into place a new, independent management team.

[67] JX 327.

[68] *Id.*

[69] Defs.' Opening Br. 39

17

That conclusion also is supported by statements Kerbawy made during the Solicitation. For example, in a March 9 email, Kerbawy updated the Director Nominees as to the progress of the Solicitation, and requested that they each execute a written consent taking their first actions as the New Board.[70] The topics addressed by the resolutions included: terminating D'Orta and Grody; appointing Kerbawy as Chairman of the New Board, President, and CEO; and appointing Steiger as General Counsel and Secretary. Absent from these proposed first steps was any mention of reinstating Bosley. On March 11, Kerbawy exchanged emails with Daniel Toohey, an ACell stockholder who responded to a Solicitation email by stating to Kerbawy that he would not support the Solicitation if it meant removing McDonnell, who was Toohey's close friend.[71] The communications were amicable, but reflected "an honest disagreement" that Kerbawy attributed mainly to McDonnell's "adamancy on retaining D'Orta," which was incompatible with Kerbawy's belief that D'Orta had to go.[72]

---

[70]  JX 604.

[71]  JX 476.

[72]  *Id.* Kerbawy stated, in part:

> You probably know that [McDonnell] and I spoke yesterday . . . . The number of issues that separate us is small in number. Like you, I like and respect [McDonnell] and considered up to the very end retaining him on the slate for the new board. [McDonnell's] adamancy on retaining D'Orta plus the politics of getting a strong majority ruled against retaining him. The politics behind me, D'Orta is the issue . . . . I can give you valuable employees and former employees who have convinced me that D'Orta . . . is harming morale, and diminishing expertise in the company.

18

Those contemporaneous documents comport with Kerbawy's testimony, which I found credible. In particular, Kerbawy testified that as his Solicitation plan became more concrete, he determined that Bosley would have only a temporary role, and that Kerbawy would be the acting CEO only until he could find a more experienced CEO.[73] Kerbawy also considered having D'Orta and Tremmel as consultants in the interim, not just Bosley.[74] Kerbawy further testified that his immediate goal for the New Board would be

---

*Id.* Defendants cite this email exchange as support for the assertion that Kerbawy was misrepresenting the gravity of the DOJ Investigation to lull more stockholders into supporting his Solicitation. *E.g.,* Defs.' Opening Br. 38. That assertion is not supported by JX 476 or the other exhibits cited. Toohey expressed concern about the Company's compliance issues, and Kerbawy's response appears to be balanced and a good faith attempt to share what information he had. He wrote, in part:

> I am eager to learn first hand from Williams & Connolly the status of the DOJ investigation. So far, everything is second-hand, and some of the information from the company conflicts with what I have heard and is self-serving to the status quo. From the research that I've done, what I believe to be the issues are not uncommon for companies such as ACell and a seasoned medical device professional such as we seek will be well versed in them, certainly better than a physician such as Dr D'Orta. I know when my group sold MatriStem, we had strong direction on avoiding off-label promotion. So that you are aware, several sources have reported that the DOJ has no criminal case under consideration for anyone at ACell (now or in the past). I might also mention that Skip Baldino, one of the new board members, has gone through a DOJ situation such as ours, a situation that resolved well for the company, and will provide valuable insight into working our way through this.

JX 476.

[73]    Tr. 32-33, 94-95.

[74]    *Id.*

to conduct a national search for a permanent CEO. That testimony is consistent with his explanation of why he concluded it was necessary to remove the Board in January 2015, after D'Orta was made the CEO without any such search.[75] As to the possibility of DeFrancesco and Bosley reassuming active roles in the Company, Kerbawy testified that "unless and until they get a clean bill of health after the [DOJ Investigation] resolves itself[,] they should have no director or officer role."[76]

### 4. Kerbawy solicits the Consents, and the Board reacts defensively

As noted above, Kerbawy's Director Nominees were himself, Anderson, Baldino, Osborne, and Pering. Anderson, Baldino, and Pering have significant experience in the medical device industry, and none of the parties dispute that they are independent of Kerbawy, DeFrancesco, and Bosley. Several stockholders told Kerbawy that he also should be on the New Board.[77] Because he envisioned the Company remaining private and attempting to rebuild its business rather than seeking a sale in the short term, Kerbawy favored having five directors on the board as opposed to seven.[78] He "struggled" with deciding who to ask for the fifth spot on his slate, considering DeFrancesco, Bosley, and McDonnell, among others.[79] After considering the issue and

---

[75]    *Id*. at 34.

[76]    *Id*. at 29.

[77]    *E.g.*, JX 327.

[78]    Tr. 26-28 (Kerbawy).

[79]    For example, in an email to Anderson dated February 9, Kerbawy referred to DeFrancesco as "a current board member who also will sit on the new board." JX 275, 294.

20

discussing it with stockholders, employees, and others, Kerbawy decided that neither DeFrancesco nor Bosley was the right choice, for two reasons: (1) he "wanted to signal that we were moving forward rather than going back"; and (2) it was inappropriate for them to be on the New Board in light of the Company's October 2014 statement that DeFrancesco and Bosley might have violated federal criminal statutes.[80]

Kerbawy's Solicitation launched on March 2 when he emailed a group of ACell stockholders to inform them that, on March 5, he would be sending them a written consent form for the purpose of replacing the Board with his Director Nominees.[81] He attached summary bios and described the qualifications of the Nominees, writing that, "[a] number of people helped in vetting the candidates. In the end, the sole consideration in selecting these individuals as candidates for our board was who can contribute the most to strengthening the company, improving management, and maximizing the potential of the technology we own."[82]

---

[80] Tr. 29 (Kerbawy).

[81] JX 330.

[82] *Id*. Defendants contend that this statement "intentionally concealed the fact that DeFrancesco and Bosley were active participants in the solicitation and that several of the candidates were identified, vetted and educated by Bosley and DeFrancesco. . . . [and] left the false impression that the slate was chosen through an independent process consistent with a 'fresh start' platform." Defs.' Opening Br. 32. It is true that Kerbawy did not state affirmatively that DeFrancesco and Bosley assisted him in the Solicitation, as I discuss in more depth *infra*. But, the totality of the evidence shows that the Director Nominees were chosen through an independent process consistent with a "fresh start" platform.

21

On March 5, Kerbawy emailed the consent forms to the first group of stockholders, consisting of those he was targeting as highly likely to support the Solicitation.[83] By the end of March 5, he had obtained written consents representing about 43% of ACell's outstanding stock. The Board found out about the solicitation that day, when a stockholder who received the March 5 email forwarded it to McDonnell.

The contemporaneous documents and trial testimony demonstrate that upon learning about the Kerbawy Solicitation, the Board's immediate, almost reflexive reaction was to assume a defensive position and dig in to defeat the effort. McDonnell circulated the email to the rest of the Board (excluding DeFrancesco, who was then still a Director), D'Orta, and Grody, writing that "it has come to our attention that Kyle Kerbawy is leading an action to replace all of the current directors of ACell," and requesting that they schedule a conference call.[84] Over the next week, the Board held a

---

[83] *E.g.*, JX 348. Defendants at one point assert that Kerbawy's March 5 email misleadingly suggested that stockholders had only 48 hours to submit their consents, because he "sought to ram the consents through so as to stifle any chance for debate." Defs.' Opening Br. 32-33. The cited email, JX 348, does not support that assertion. It states, "[p]lease complete and send your consent form within 48 hours. Consents received after midnight EST on March 13, 2015 [*i.e.*, eight days later] may not be counted. If you have questions, please email . . . or call me . . . ." *Id.*

[84] JX 376. I infer from McDonnell's decision on March 5 to exclude DeFrancesco from the Board's written communications and calls regarding Kerbawy's Solicitation that he knew or had inferred that DeFrancesco was aligned with Kerbawy. This fact undermines Defendants' argument that other ACell stockholders would not have known that fact without being told about it by Kerbawy. As described below, Kerbawy first sent a communication to that effect on March 6, 2015.

series of such calls, each time excluding DeFrancesco, whom McDonnell now considered "an adversary" who had "effectively forfeited his rights as a member of the board."[85]

The Board began communicating furiously with ACell's stockholders, attempting to persuade them against executing consents in Kerbawy's favor. McDonnell wrote on March 6 that, "[w]e are reaching out to everyone we know on the list of people who received Kyle's emails. . . . There is a BOD call over the weekend to discuss potential legal action as well."[86] The outreach effort included McDonnell, Pfinsgraff, D'Orta, and Grody calling stockholders,[87] and McDonnell offering to travel several hours to meet in person with several large stockholders.[88] McDonnell and Pfinsgraff also emailed stockholders, advising them that if they were "even thinking about" supporting the Kerbawy Solicitation, "please do not do so without talking to myself or [stockholder] Steve Graham first."[89]

On March 6, Kerbawy emailed a group of ACell stockholders, stating that the Solicitation was off to a "good start," and that:

> Among the consents that we received were those of former CEO Jim DeFrancesco who also owns the largest number of ACell shares. Jim earlier wrote to a fellow shareholder "I agree with Kyle and his rational[e] that the company would

---

[85]    Tr. 517-20 (McDonnell).

[86]    JX 376.

[87]    Tr. 484-86 (McDonnell); JX 387, 399, 384, 401.

[88]    JX 419. That meeting did not occur.

[89]    JX 373, 399, 384, 375, 419.

23

be better served with a more experienced Board of Directors. I will be voting my shares according to his directive."[90]

The next day, Kerbawy sent an email to a different group of ACell stockholders, including several current employees (the "March 7 Email").[91] The March 7 Email, which Defendants attack on various grounds, stated in relevant part:

> A majority of ACell shareholders have voted to replace the current Board of Directors with the experienced medical device professionals recommended in our consent effort.
>
> Somewhat disturbing, however, is a report that the current board is attempting to increase the number of outstanding shares by rushing through option exercises. We also have heard that shareholders who have not yet consented are being told that we intend to return Jim DeFrancesco to an officer position, which is not true.
>
> ACell needs leadership from medical device professionals who will bring experience, maturity, and a fresh perspective to our company. We want to move forward, not backwards.
>
> We are still looking to add shares to our total in order to provide a cushion on the assumption that directors and officers are issuing new shares.[92]

---

[90] JX 377.

[91] JX 389, 404 (the March 7 Email).

[92] *Id*. The "report" Kerbawy referred to in the March 7 Email was from Tres Riley, then ACell's Vice President of Sales. Riley was acting as Kerbawy's "eyes and ears" inside the Company, and the two exchanged numerous text messages between March 6 and 16, 2015, that depict themselves as brothers-in-arms. JX 370; Tr. 107-09 (Kerbawy). Riley told Kerbawy that, while listening through a wall at ACell's office, he had heard that the Board was attempting to increase the number of outstanding shares by exercising options. Tr. 109-10 (Kerbawy). As discussed below, Defendants characterize this aspect of the March 7 Email as misleading because they deny there was any such attempt on the Board's part. Tr. 632-33 (McDonnell).

24

Kerbawy testified that he refrained from sending the Solicitation materials to employees before he was sure that he had a majority, so that "it would be safe for them" to execute consents. He reasoned that if a stockholder-employee supported him and he lost, "their jobs would be at risk," and said that he knew of several employees who had been threatened in this regard in the October 2014 DeFrancesco Solicitation.[93] Defendants, not implausibly, characterize the outreach to stockholders (and especially stockholder-employees) as designed to coerce them into supporting the Kerbawy Solicitation out of fear that if they did not get on the winning side, they might be at risk.[94]

One of the Board's main responses was to send a letter via email to all of ACell's stockholders on March 8 (the "March Board Letter").[95] In that Letter, the Board sought to correct what it perceived as misinformation that the stockholders might be relying on in supporting the Kerbawy Solicitation. Among other things, the Board stated that "Mr. Kerbawy's actions are motivated by a lack of information and understanding on his part regarding the Company's operations and its posture in connection with the [DOJ Investigation]."[96] The Letter stated that the Kerbawy Solicitation posed the risk of undoing the Company's efforts to resolve its compliance problems, and that the "Board

---

[93]    Tr. 36-37.

[94]    *E.g.*, Defs.' Opening Br. 34. Defendants' effort to claim the high ground on this issue lost nearly all credibility, however, after they fired several employees upon finding out that they executed Consents in favor of Kerbawy.

[95]    JX 411 (the March Board Letter).

[96]    *Id.*

25

of Directors and senior management of the Company are, thus, vehemently opposed to Mr. Kerbawy's actions." In the next paragraph, the Letter sought to bolster the stockholders' confidence in the Board, stating:

> Moreover, contrary to Mr. Kerbawy's claim, the Company's current Board of Directors and senior management consist of highly qualified, experienced, and sophisticated individuals who are fully committed to the Company, its stockholders, and maximizing stockholder value. For your convenience, at the end of this letter we have included bios for these individuals[,] *excluding Jim DeFrancesco, with whom most if not all of you are already very familiar and who remains on the Board of Directors.*[97]

The Letter strongly urged stockholders not to give Kerbawy their consents, and included a form for stockholders to revoke consents already executed.

I find the March Board Letter to be misleading, in that it would give a reasonable stockholder the impression that DeFrancesco was aligned with McDonnell and the incumbent Board. Nowhere in the Letter, which went through multiple drafts and was reviewed by every Board member (except DeFrancesco) as well as counsel, did the Board mention that it suspected that DeFrancesco and Bosley might be assisting in the Kerbawy Solicitation. It did not inform stockholders that the Board was excluding DeFrancesco from Board meetings and treating him as an adversary, even though McDonnell and the other Directors took that stance at least three days earlier. Indeed, the Letter states unequivocally that "the Board of Directors are . . . vehemently opposed to Mr. Kerbawy's actions," while in the next lines falsely implies that DeFrancesco, "with whom most if not

---

[97] *Id.* (emphasis added).

26

all of you are already very familiar and who remains on the Board of Directors," was part of the "Board of Directors" opposing the Kerbawy Solicitation.

These statements cannot be explained away as the product of mere carelessness or rushed drafting in the heat of a hostile consent solicitation.[98]  A central tenet of Defendants' ultimate argument as to why Kerbawy's Solicitation needed to be defeated—and why this Court should now set aside the Consents on equitable grounds—was that Kerbawy was misleading stockholders into supporting him without adequately disclosing that he had DeFrancesco and Bosley on his side.  If as of March 8 the Board truly believed that, it is inexplicable why the Letter was written the way it was.  Because the Board began excluding DeFrancesco on March 5, I infer that they believed then that he was backing Kerbawy.  Yet, the March Board Letter did not disclose that.  I find that the most reasonable inference from the evidence presented is that the reason for the omission is that the Board wished to muddy the waters by implying that DeFrancesco, who was admittedly popular with many stockholders, remained in their camp.  Because the March Board Letter went through several drafts that were reviewed by the Board and its counsel,

---

[98]  McDonnell's testimony in this regard, Tr. 553-69, does not change my view of the March Board Letter.  Although McDonnell refused to concede that the Letter was misleading, he admitted that at the time the March Board Letter went out, the Board considered DeFrancesco an adversary and was excluding him from Board communications regarding the consents. *Id.* at 562-67.  Nor were the misleading statements cured by the purportedly remedial letter sent by the Board on March 11, JX 474, by which time the Board had received and rejected the written consents, and filed this action.

27

I do not find credible McDonnell's suggestion that the attorneys mistakenly caused the confusion regarding DeFrancesco.[99]

On March 10, 2015, Kerbawy delivered written consents representing 24,147,798 shares of ACell voting stock, or roughly 53.3% of the 45,304,546 issued and outstanding shares of voting stock (the "Consents").[100]

Before the Consents were even delivered, the Board had determined that it was not going to accept them as valid, and would not vacate their board seats until ordered to do so.[101] Upon review of the Consents, Pfinsgraff learned that at least two current employees, Tres Riley and a regional sales manager, Kay Lay, had supported Kerbawy. That night, in an email to D'Orta, Pfinsgraff recommended that Riley and Lay be fired.[102] Just two weeks earlier, Pfinsgraff had supported increasing Riley's bonus compensation structure, and McDonnell testified that Riley was an excellent salesman, "one of the best"

---

[99] Tr. 563-67.

[100] Kerbawy actually delivered consents that, on their face, added up to 23,948,944. JX 600 ¶ 41; JX 714. The larger figure includes 198,854 shares that were not initially accounted for because two stockholders mistakenly wrote in the wrong number of shares on their consents. The 24,147,798 share total excludes 21,000 shares that Plaintiff agrees were erroneously included on two stockholders' consents due to scriveners' errors. Defendants do not dispute that those shares should be included, nor do they raise any technical or numerical arguments as to whether the Kerbawy Solicitation achieved a majority. The only other numerical issue, as I note *infra*, relates to whether I should set aside Bosley's shares.

[101] Tr. 573 (McDonnell).

[102] JX 462.

28

in the Company.[103] After learning that they had supported Kerbawy, however, Pfinsgraff concluded that Riley and Lay "now were being extraordinarily disloyal."[104]

Those actions, in addition to the Board's immediate determination to refuse to recognize the Consents regardless of the outcome, reflect the tenacity with which the Board sought to defeat the Kerbawy Solicitation. When asked if he believed it was appropriate for him to "work to defeat stockholder intent," McDonnell responded unequivocally that it was.[105] He viewed himself as being "at war" with Kerbawy, DeFrancesco, and Bosley ever since learning of the Kerbawy Solicitation, and was "prepared to do whatever it takes to win this war."[106]

### C. Procedural History

Kerbawy filed this action the same day he delivered the Consents, March 10, 2015. He seeks a declaratory judgment pursuant to 8 *Del. C.* § 225 that Defendants, McDonnell, Moliteus, Pfinsgraff, D'Orta, Mullins, and Tremmel, validly were removed by a majority of ACell stockholders acting by written consent, and that the New Board validly was elected to replace them.

Defendants counterclaimed against Kerbawy and filed third-party claims against DeFrancesco. As amended, Defendants' Counterclaims and Third-party Complaint charge Kerbawy with making misleading disclosures in connection with his Solicitation,

---

[103]    Tr. 614-15.

[104]    *Id*. at 245.

[105]    *Id*. at 489-90.

[106]    *Id*. at 488.

29

and accuse DeFrancesco of breaching his fiduciary duties by facilitating Kerbawy's actions in that regard. Defendants also allege that Kerbawy and DeFrancesco tortiously interfered with Bosley's Separation Agreement, which they claim Bosley breached by participating in the Solicitation.

I presided over a two-day trial on May 13 and 14, 2015. Thereafter, the parties submitted expedited briefing and I heard argument June 26. This Memorandum Opinion contains my post-trial findings of fact and conclusions of law.

## D. Parties' Contentions

Defendants contend that this Court is empowered to determine whether the Kerbawy Solicitation was fair, and to invalidate the results of that Solicitation if it was procured through breaches of fiduciary duty, misleading disclosures, or breaches of contract. They argue that the evidence proves that the consent solicitation was not fair, and that the ACell stockholders' decisions to execute consents were not informed, and thus the only equitable result is to set aside those Consents.

Kerbawy and DeFrancesco assert that Defendants have misconstrued the relevant standard in this regard, and that they essentially seek to have the Court enforce a purported right to engage in a full policy debate, which is not required under the consent statute or equity. Kerbawy argues that, in any event, none of the equitable grounds Defendants advance are supported by the factual record or equitable considerations.

## II. LEGAL STANDARD

Under Section 228(a) of the Delaware General Corporation Law ("DGCL"), unless otherwise provided in the certificate of incorporation, stockholders may act by

written consent upon any action that may be taken at any annual or special meeting of stockholders, "without a meeting, without prior notice and without a vote."[107] Written consents delivered pursuant to Section 228 are required to bear the date of signature of each stockholder who signs the consent.[108] Action by written consent is effective under the statute only if a number of consents sufficient to take the action are delivered to the corporation within sixty days of the earliest dated consent.[109]

In an action such as this one under Section 225, "[u]pon application of any stockholder," the Court of Chancery "may hear and determine the validity of any election."[110] "One of the most frequent theories under which stockholders have asked this Court to find an election invalid is a breach of fiduciary theory—in particular, a claim that the company and the board of directors made material misstatements or omissions" during the solicitation process.[111] A challenge under Section 225 also might allege that a director or board "does not validly hold corporate office because that director obtained the office through fraud, deceit, or breach of contract."[112] As relevant

---

[107]    8 *Del. C.* § 228(a).

[108]    *Id*. § 228(c).   The date-of-signature requirement in Section 228(c) has been construed strictly.  *See H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 151-52 (Del. Ch. 2003).

[109]    *Id.*

[110]    8 *Del. C.* § 225.

[111]    *Red Oak Fund, L.P. v. Digirad Corp.*, 2013 WL 5740103, at \*10 (Del. Ch. Oct. 23, 2013).

[112]    *Genger v. TR Invs., LLC*, 26 A.3d 180, 200 (Del. 2011).

31

here, if a fiduciary breaches his or her disclosure obligations in connection with soliciting stockholders' votes or consents, and the Court finds that such breaches "inequitably tainted the election process," that could be grounds for setting aside otherwise valid votes or consents.[113]

Regardless of the theory under which the removal or election of a director is challenged, "[t]he burden of proving that a director's removal or election is invalid rests with the party challenging its validity."[114] In a case like this one, where a majority of stockholders have executed written consents removing the Board and the Board asks this Court to set aside the consents on equitable grounds, that burden is a heavy one. This is particularly true in light of the importance Delaware law places on protecting the stockholder franchise, which "has been characterized as the 'ideological underpinning' upon which the legitimacy of the directors managerial power rests."[115]

## III.    ANALYSIS

ACell's certificate of incorporation does not eliminate or limit stockholder action by written consent.[116] Aside from the issues noted *supra* in Section I.B.4, the parties do not dispute the validity of the Consents on any technical grounds. I therefore conclude that the Consents are presumptively valid and binding upon ACell and its Board.

---

[113]    *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 72 (Del. Ch. 2008).

[114]    *Unanue v. Unanue*, 2004 WL 5383942, at *10 (Del. Ch. Nov. 9, 2004).

[115]    *MM Cos., Inc. v. Liquid Audio, Inc.*, 813 A.2d 1118, 1126 (Del. 2003) (quoting *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 659 (Del. Ch. 1988)).

[116]    JX 2.

Defendants assert that the Court should set aside the otherwise valid Consents on equitable grounds, contending that they were procured by: (1) Kerbawy's allegedly misleading disclosures, in violation of his purported duty of disclosure; (2) DeFrancesco's misuse of Company confidential information, in violation of his fiduciary duties; and (3) Kerbawy and DeFrancesco's tortious interference with Bosley's Separation Agreement. For the reasons stated herein, I conclude that none of Defendants' equitable arguments are sufficient to justify setting aside the Consents executed by a majority of ACell's stockholders.

## A. Alleged Disclosure Violations

### 1. Was Kerbawy under a duty of disclosure?

Defendants argue that Kerbawy had a duty of disclosure in connection with the Consent Solicitation, because Kerbawy was working with DeFrancesco, who as a Director owed fiduciary duties to ACell and its stockholders. Thus, Defendants urge the Court to hold Kerbawy to the same disclosure requirements as would have applied to the directors pursuant to their fiduciary duties. Defendants also advance the more general proposition that "a duty of disclosure applies to the solicitation of consents," and that this Court can and must intervene because Kerbawy failed to fully disclose all material facts underlying his Solicitation.[117]

Although I ultimately need not decide the issue, I would reject Defendants' argument that, regardless of the fact that he is only a minority stockholder and not a

---

[117] *E.g.*, Defs.' Reply Br. 26-32.

director or officer, Kerbawy is subject to a duty of disclosure in connection with his effort to solicit written consents. Most of the cases on which Defendants rely in this regard stand for the proposition that, "[d]irectors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[118] Those cases stand for the unremarkable proposition that the director's fiduciary duties encompass the so-called duty of disclosure, which "is not an independent duty, but derives from the duties of care and loyalty."[119]

Kerbawy, however, is not a director, officer, controlling stockholder, or member of a control group. Defendants do not cite any case holding that such a minority stockholder generally owes any fiduciary duties, or a duty of disclosure specifically.[120]

---

[118] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992); *see also, e.g.*, *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 678 A.2d 533, 537 (Del. 1996); *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1276-77 (Del. 1994); *Kurz v. Holbrook*, 989 A.2d 140, 183 (Del. Ch.) ("The duty of disclosure applies to directors who solicit written consents.") *aff'd in part, rev'd in part sub nom. Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377 (Del. 2010); *Zaucha v. Brody*, 1997 WL 305841, at *4 (Del. Ch. June 3, 1997) ("[E]quitable relief may be granted for a fiduciary's non-fraudulent failure to disclose material facts in soliciting consents."), *aff'd*, 697 A.2d 749 (Del. 1997).

[119] *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009).

[120] In the one case Defendants cited as support for "a duty of disclosure [that] derives from the common law standard that applies when soliciting consents," Defs.' Reply Br. 28, the individuals whose allegedly misleading disclosures the Court enjoined were the President and Secretary of the corporation, who had solicited proxies from the stockholders under the guise of board-approved authority, when in fact they had none. *Empire S. Gas Co. v. Gray*, 46 A.2d 741, 745-46 (Del. Ch. 1946). Because the individuals whose actions the Court scrutinized there were officers and would have owed fiduciary duties on that basis, that case is different from the situation here.

34

Indeed, to the contrary, non-controlling stockholders generally do not owe fiduciary duties, even if they are attempting to become directors.[121] "Just as Delaware law does not require directors-to-be to comply with their fiduciary duties, former directors owe no fiduciary duties."[122] Defendants have not even attempted to prove that Kerbawy qualifies as a fiduciary on grounds of being a controlling stockholder, director, or officer. Thus, because the disclosure obligations flow from the traditional fiduciary duties of care and loyalty, which Kerbawy does not owe, Defendants' argument is analytically flawed. The risk of attributing to stockholders a duty that our law does not clearly impose on them, together with the reality that this Court "'must act with caution and restraint when ignoring the clear language of the [DGCL] in favor of other legal or equitable principles,'"[123] leads me to conclude that Kerbawy, on his own, would not owe a fiduciary duty of disclosure in connection with his Solicitation. Thus, I reject Defendants' suggestion that I should impose such a duty on him.[124]

---

[121] *E.g.*, *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 995 (Del. Ch. 2014) ("[I]n deciding whether a stockholder owes a fiduciary obligation to the other stockholders of a corporation in which it owns only a minority interest, the focus of the inquiry is on whether the stockholder can exercise actual control over the corporation's board.").

[122] *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 758 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

[123] *Unanue v. Unanue*, 2004 WL 2521292, at *9 (Del. Ch. Nov. 3, 2004) (quoting *Stroud*, 606 A.2d at 87).

[124] This does not mean that Kerbawy or any other stockholder has license to mislead a fellow stockholder in soliciting written consents. A stockholder clearly could challenge the results of an election or bring a claim against another stockholder (or any person, for that matter) who convinced the stockholder to vote or execute a

35

In the alternative, Defendants contend that Kerbawy should be held to a duty of disclosure because DeFrancesco, who was at all relevant times a director and fiduciary of ACell, participated in the Kerbawy Solicitation. As discussed above, the evidence supports a finding that Kerbawy, DeFrancesco, and Bosley worked together in furtherance of the Kerbawy Solicitation. Furthermore, DeFrancesco's involvement was not merely in his capacity as a stockholder. For example, he allowed Kerbawy and Steiger to use documents and information that he had obtained due to his current role as a Director and previous role as CEO of ACell. He also allowed Kerbawy to use his name and forward a quote from him in a show of support for Kerbawy's Solicitation, a move clearly designed to persuade other stockholders that the Solicitation should be viewed as having legitimacy, because it was supported by a major stockholder and sitting director. In this respect, I note that, "even acting in their individual capacities, directors owe a duty of candor to the stockholders of the corporation for which they serve."[125] Thus, I agree that DeFrancesco himself would be held to a duty of disclosure in this situation.

All of the challenged disclosures, however, were Kerbawy's, not DeFrancesco's. Defendants therefore ask me to hold that DeFrancesco's duties are imputed to Kerbawy or Kerbawy is transformed into a fiduciary of ACell, because DeFrancesco helped him in

---

consent on false pretenses or by fraud. That defrauded stockholder would have a claim cognizable either under Section 225 or in a plenary action. But, the record in this case contains no indication of any stockholder alleging that he or she was defrauded by Kerbawy.

[125] *Flaa v. Montano*, 2014 WL 2212019, at *9 (Del. Ch. May 29, 2014); *see also Zaucha*, 1997 WL 305841, at *4.

36

his Solicitation effort in the relatively limited way reflected by the facts of this case. The only case Defendants cite as support for this theory is *Kurz v. Holbrook*,[126] but it does not really address the issue. Therefore, I am reluctant to hold that Kerbawy is subject to fiduciary duties, including the duty of disclosure, in the circumstances of this case.[127] Ultimately, however, I need not make that decision because, as I next discuss, even if Kerbawy did owe a duty of disclosure, the disclosure violations that Defendants identify in support of setting aside the Consents on equitable grounds are not sufficient to justify doing so.

### 2. Should the Consents be set aside on grounds of any challenged disclosure?

I consider the merits of Defendants' disclosure challenges with a view toward determining whether any alleged breach of the duty of disclosure "inequitably tainted the

---

[126] 989 A.2d 140 (Del. Ch. 2010), *aff'd in part, rev'd in part sub nom. Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377 (Del. 2010). In *Kurz*, the consents that were challenged on disclosure grounds had been solicited by an LLC, one member of which was a sitting director. *Id*. at 144-45. The Court considered whether certain of the LLC's statements in connection with the solicitation were materially misleading, and concluded they were not. The issue posed here—whether a person who otherwise would not owe fiduciary duties should be subject to a duty of disclosure on the basis that he was assisted by a sitting director—was neither discussed nor explicitly decided in *Kurz*. *Id*. at 183-84.

[127] The duty of disclosure, like all fiduciary duties, derives from "the principle . . . stated most generally, [that] one who controls property of another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner." *In re USACafes, L.P. Litig.*, 600 A.2d 43, 48 (Del. Ch. 1991). In this case, I am not convinced that Kerbawy, directly or indirectly, comes within that principle.

37

election process" and would be grounds for setting aside the Consents.[128] In this regard, if a majority of stockholder consents were procured at least in part by materially misleading disclosures, that could support such a finding of inequity that would warrant the Court's intervention. A statement, omission, or partial disclosure is considered material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote," or if, "under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder[,] . . . [or] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[129] In assessing materiality, this Court considers all the relevant circumstances, including "the nature of the corporation and its business, the information already available to stockholders, the other information being provided in the solicitation, and the type of action being solicited."[130]

### a. The role of Bosley and DeFrancesco in the Kerbawy Solicitation

Defendants contend the record shows that DeFrancesco and Bosley not only voted in favor of Kerbawy's plan, but were "equal participants in designing" that plan and active participants in each step of its execution.[131] They assert that stockholders were

---

[128] *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 72 (Del. Ch. 2008).

[129] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[130] *Kurz*, 989 A.2d at 183.

[131] Defs.' Reply Br. 34.

entitled to know about the extent of that participation, because DeFrancesco and Bosley's involvement "makes it likely that DeFrancesco and Bosley would have a material role in shaping the corporate policy that the new board would implement—which is exactly what occurred."[132] This aspect of Defendants' disclosure claim is without merit for several reasons.

First, the facts do not support Defendants' assertion in this regard. The totality of the evidence convinces me that, while Kerbawy involved DeFrancesco and Bosley in his Solicitation and made use of the information and assistance they provided, it was Kerbawy who made the critical decisions as to: whether to run the Solicitation; when and how to go about amassing the Consents; which stockholders to contact, and how to persuade them to join; what vision for the future of ACell the New Board should espouse; and who would be the Director Nominees. In short, contrary to many statements made by Defendants throughout their briefing and argument, it was Kerbawy's Solicitation, in which DeFrancesco and Bosley—along with many other individuals—played supporting roles. I reject as unconvincing Defendants' allegation that it was "just as much DeFrancesco and Bosley's Solicitation as it was Kerbawy's." Thus, I do not consider the extent of DeFrancesco and Bosley's support, such as it was, to have been a material fact that Kerbawy failed to disclose fully and fairly.[133] In fact, one day after formally

---

[132] *Id.*

[133] Defendants heavily rely on Joanne Watson's testimony to prove the materiality of the role DeFrancesco and Bosley played in the Kerbawy Solicitation. Tr. 644-66 (Watson). Although I found Watson's testimony credible, it does not change my view as to this issue. Viewed in isolation, Watson's statements would support a

39

launching his Solicitation, Kerbawy publicly signaled that DeFrancesco was on his side. Given the degree of DeFrancesco and Bosley's involvement, and the fact that the New Board is an independent board that will be managing ACell going forward, I find that Kerbawy satisfied any disclosure obligation he might have had.[134]

Second, even accepting Defendants' premise that Kerbawy should have disclosed more about Bosley and DeFrancesco's role than he did, I do not find this disclosure deficiency sufficient to justify setting aside the validly executed Consents. Defendants have a heavy burden in asking the Court potentially to disenfranchise a majority of the

---

finding that a reasonable stockholder would have found it important to know of DeFrancesco's participation. The primary import of Watson's testimony, however, was that she believed then and believes now that Kerbawy's Director Nominees and platform generally represent a "fresh start," which is what she was seeking. In any event, Watson's testimony would be insufficient to overcome the effect of the March Board Letter on this issue, which I address shortly *infra*.

[134] In arguing for a contrary conclusion, Defendants assert that the extent of DeFrancesco and Bosley's involvement should have been disclosed pursuant to "the broader proposition that stockholders must be able to assess fairly the bona fides of an insurgent's campaign platform, and, thus, it is material to stockholders to know who all the proponents of the solicitation are." Defs.' Reply Br. 34 (citing *Portnoy*, 940 A.2d 43; *Flaa v. Montano*, 2014 WL 2212019; *Henwood*, 1961 WL 116793). In *Portnoy*, members of the board conspired with a stockholder who agreed to help them defeat a consent solicitation if the board would create a new seat and appoint him to it. The Court found that agreement material and held that its omission inequitably tainted the election. *Flaa* similarly involved an agreement, unknown to the stockholders, to appoint a director that was found material and inequitable. This case is distinct from those situations. Additionally, *Henwood* was decided under the federal securities laws, not Delaware's law of fiduciary duty, and I find it inapposite.

40

stockholders, and a breach of the duty of disclosure (again, assuming such a duty even applies here) only supports that result if it "inequitably taints the electoral process."[135]

The fact of the matter is that Defendants' actions with respect to informing the stockholder base about the role DeFrancesco and Bosley played in the Kerbawy Solicitation were equally as misleading, if not more so, than anything Kerbawy said or did not say. While Defendants complain now about how DeFrancesco's and Bosley's involvement irredeemably tainted the Kerbawy Solicitation, when the Board had the chance to alert stockholders to this purportedly material fact, it failed to do so. In fact, Defendants implied through ambiguous language in the March Board Letter that DeFrancesco remained on the "Board," and, as such, was "vehemently" opposed to Kerbawy's Solicitation. In these circumstances, I do not consider it to be equitable to set aside the Consents on the grounds that Kerbawy did not disclose something that the Board itself also failed to disclose when it had the time and ability to do so.[136] For all of these reasons, I conclude that Defendants have failed to satisfy their burden of proving that the Consents should be set aside on equitable grounds due to materially misleading disclosures about the role of DeFrancesco and Bosley in the Kerbawy Solicitation.

---

[135] *Portnoy*, 940 A.2d at 72.

[136] This Court "refuses to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals." *Nakahara v. NS 1991 Am. Trust*, 718 A.2d 518, 522 (Del. Ch. 1998). Defendants' actions here in regard to the March Board Letter contribute to this Court's consideration of the equities of this case, but I do not consider them dispositive in the same sense that an unclean hands defense might be.

### b. The "corporate agenda" of Kerbawy, DeFrancesco, and Bosley

Defendants contend that Kerbawy, DeFrancesco, and Bosley had a definite agenda as to the first steps the New Board would take, from the hiring and firing of key employees, to the Company's strategy vis-à-vis the DOJ investigation. Because those plans were "pre-ordained," according to Defendants, they needed to be disclosed to stockholders in connection with the Kerbawy Solicitation.

As with the disclosure claim relating to the role of DeFrancesco and Bosley, the record does not support Defendants' claim about Kerbawy's purportedly secret plans for ACell. Concerning the DOJ Investigation, Kerbawy's contemporaneous communications demonstrate that, at the time of the Solicitation, he had an open mind and wanted to learn more information from Williams & Connolly. More importantly, however, even if he was determined to "fight the DOJ" as Defendants suggest, Kerbawy was only one of five directors on the New Board. Based on the record as to the qualifications and independence of the other Director Nominees, I would have to draw unreasonable inferences unsupported by the record to conclude that those individuals somehow would be puppets for Kerbawy (or DeFrancesco or Bosley, for that matter) when it came to the DOJ Investigation, or any other aspect of the business and affairs of ACell. Thus, I find Defendants' argument that Kerbawy's failure to disclose the alleged "fight the DOJ" plan warrants invalidating the Consents to be misplaced on multiple levels.

As to the firing of D'Orta, Grody, and possibly other employees, I reach a similar conclusion. Kerbawy successfully campaigned on a "fresh start" platform, featuring a slate of Director Nominees with impressive industry experience and no meaningful

42

connections to either side of the old Board versus New Board divide. A reasonable stockholder would have assumed that some, and perhaps many, employees would be terminated, as the "fresh start" platform implies. In any event, in contemporaneous communications with any stockholder who would listen, Kerbawy made no secret of the fact that he believed D'Orta needed to be replaced. Thus, the facts do not bear out Defendants' argument that Kerbawy's disclosures were misleading or otherwise deficient due to material omissions.

### c. Kerbawy's March 7 Email

Defendants contend that Kerbawy's March 7 Email was materially misleading in several ways. First, Defendants challenge Kerbawy's statement that a majority of the stockholders had voted to replace the Board, when that was not in fact true at that moment. Defendants further argue that the March 7 Email was designed to have a coercive effect on stockholders who also were employees of the Company, because, upon learning that Kerbawy and his slate were the new Directors, they would feel compelled to join the winning side. In addition, Defendants assert that the March 7 Email was misleading based on Kerbawy's allusion to a report that the Board was "attempting to increase the number of outstanding shares by rushing through option exercises." I address these issues in turn.

In the specific factual context of this case, I do not consider Kerbawy's statement that a majority of ACell stockholders had voted to replace the Board to be a material misrepresentation that would justify setting aside the Consents. The main reason is that, even assuming a reasonable ACell stockholder might have considered Kerbawy's

43

prediction of success to be important in deciding whether and how to vote, the impact of that statement does not cut clearly in one direction or the other. It is plausible, as Defendants emphasize, that an ACell stockholder who also was employed at the Company might feel pressured to join the winning side in the Solicitation even though, all else being equal, they might have preferred to stay with Defendants' Board or remain neutral. It is equally plausible, however, that there were some ACell stockholder-investors who, all else equal, wanted to join Kerbawy's Solicitation but would have feared doing so if they were not virtually certain his effort would prevail. The record suggests that there was some evidence of the latter dynamic in connection with the October 2014 solicitation. Moreover, as to ACell stockholders not employed at the Company, Kerbawy's prediction of victory easily could have resulted in a reasonable stockholder deciding not to vote on the theory that, if the outcome already was clear, their consent would not make a difference anyway.

Thus, even if I were to assume that Kerbawy's prediction of victory would have been viewed as material, I am not persuaded that it justifies setting aside the Consents because it is not clear what effect the statement would have had on the vote. Defendants suggest that because Kerbawy *received* consents representing approximately 2.7 million shares after sending the March 7 Email, the Court should infer that materially misleading statements in the email caused stockholders to *deliver* those consents.[137] Kerbawy believed, however, that consents representing a majority of the outstanding shares of

---

[137] *E.g.*, Defs.' Opening Br. 57; Defs.' Reply Br. 41.

44

ACell already had been executed in support of Kerbawy's slate before he sent the March 7 Email.[138] In fact, Defendants' own Demonstrative Exhibit 1 shows that consents representing approximately 22,905,456 shares (or 50.6% of shares outstanding)—including 1.3 million of the 2.7 million shares Defendants argue were received after the March 7 Email—were executed before Kerbawy sent the email.[139] I am not persuaded, therefore, that the March 7 Email caused stockholders to execute and deliver the consents necessary to give Kerbawy the majority he needed; without witness testimony or additional evidence to that effect, reaching such a conclusion would be speculative at best. As a separate and independent ground for reaching this conclusion, I do not find this aspect of the March 7 Email to be material. One reason is that the effect on a reasonable stockholder of the March 7 Email's prediction of victory likely would have been neutralized, one day later, by her receipt of the competing letter from the Board, which included a form and instructions for revoking consents. Even if a stockholder had taken Kerbawy's assertion at face value, she would have been forced by Defendants' letter and revocation form to reconsider whether the contest truly was settled.[140]

As to Kerbawy's statement that he had received a "report that the current board is attempting to increase the number of outstanding shares by rushing through option

---

[138] Pl.'s Opening Br. 36; Pl.'s Reply Br. 13.

[139] Pl.'s Reply Br. Ex. 1.

[140] *See Red Oak Fund, L.P. v. Digirad Corp.*, 2013 WL 5740103, at \*11-12 (Del. Ch. Oct. 23, 2013) (declining to set aside the results of a proxy solicitation based on disclosure challenge relating to the leaking of preliminary election results).

45

exercises," Kerbawy in fact received such a report from Riley and believed it to be true. Defendants make much of the fact that Riley acquired the information by eavesdropping through his office wall that he shared with Miles Grody, the Company's General Counsel, on conversations of ACell's officers. That the source of the information admittedly was ignoble does not necessarily mean that, as Defendants contend, Kerbawy's statement was "reckless[]"[141] or "false and misleading."[142] In fact, during email communications that same day with a sympathetic stockholder, McDonnell advised that he recently had exercised stock options and that "any options exercised before the 13th will count."[143] Thus, McDonnell essentially was instructing a stockholder to do just what Kerbawy's statement indicated the Board might attempt to do. That fact merely buttresses Plaintiff's convincing showing that Defendants moved immediately and furiously to defeat the Kerbawy Solicitation, and were willing to do "whatever it took" to be successful. Against that backdrop, I cannot conclude that Kerbawy's statement, which he had a legitimate basis to believe was true, was so "reckless" or "false and misleading" as to justify granting Defendants' claim to set the Consents aside.

## B. Alleged Tortious Interference with Bosley's Separation Agreement

Defendants contend that both Kerbawy and DeFrancesco knew about Bosley's Separation Agreement and nevertheless asked Bosley to assist in the Kerbawy Solicitation, thereby causing him to breach the Agreement. Because that alleged

---

[141] Defs.' Opening Br. 56-57.

[142] *Id.* at 34, 56; Defs.' Reply Br. 41.

[143] JX 606.

46

interference with the Separation Agreement was unjustified and caused ACell harm, Defendants argue, Kerbawy and DeFrancesco are subject to a claim for tortious interference, and because the Consent Solicitation was furthered by that interference, Defendants assert that the "only equitable result is for the Court to invalidate the solicitation."[144] For the following reasons, I disagree.

The preponderance of the evidence supports the conclusion that by assisting Kerbawy in his Solicitation—*i.e.*, helping Kerbawy formulate a plan for the New Board, giving him Company information, and recommending and communicating with individuals who would be qualified to serve on the New Board, Bosley breached the Standstill and Confidentiality Provisions of the Separation Agreement.[145] As discussed *supra*, Bosley's involvement was somewhat limited and, therefore, I have rejected Defendants' overblown assertion that the Kerbawy Solicitation was "as much Bosley's as it was Kerbawy's." Nevertheless, Bosley breached the Agreement, and neither Plaintiff nor DeFrancesco seriously contend otherwise.[146]

Bosley is not a party to this action, however. Hence, the relevant question is whether the record supports Defendants' claim that Kerbawy and DeFrancesco tortiously

---

[144] Defs.' Reply Br. 45.

[145] The Separation Agreement prevented Bosley from both directly or indirectly soliciting consents and directly or indirectly becoming a "participant" or assisting any other person in such a solicitation (the Standstill Provision) and forbid him from misusing Company confidential information (the Confidentiality Provision). Standstill Agreement §§ 4-5.

[146] *E.g.*, Pl.'s Reply Br. 22-24; DeFrancesco's Reply Br. 19-23.

interfered with Bosley's Separation Agreement. The elements for proving tortious interference with contract are: (1) a contract, (2) about which the defendant knew, and (3) an intentional act by that defendant that is (4) without justification and is (5) a significant factor causing a breach of the contract and resulting injury.[147] I seriously question whether Kerbawy's and DeFrancesco's alleged interference with Bosley's Separation Agreement was "without justification" and a significant factor in causing injury to ACell—which is the party to the Agreement, not Defendants. Defendants contend that ACell had bargained for the right to be free from Bosley participating in another consent solicitation, in exchange for which the Company allowed him to retain certain stock options and other interests as part of an agreed upon separation. The suggestion is that, absent the Separation Agreement, ACell might have terminated Bosley for cause and sought to claw back from him the options and other interests he held.

Importantly, the only reason the alleged tortious interference properly is before me in the context of this Section 225 action is "because [it] bear[s] directly on [the New Board's] entitlement to office," but "the nature of a § 225 action does limit the scope of relief [Defendants] can obtain if they are successful on these claims."[148] In this *in rem* action, for example, I could not order Bosley to forfeit his stock options or any other interest he obtained through the Separation Agreement, nor could I award ACell

---

[147] *Agranoff v. Miller*, 1999 WL 219650, at *21 (Del. Ch. Apr. 12, 1999), *aff'd*, 737 A.2d 530 (Del. 1999).

[148] *Id*. at *18.

compensatory damages for breaches of the agreement.[149]  Even if I were to enforce the parties' obligations under the Separation Agreement by removing all of Bosley's shares from the total number of shares included in the Consents, however, the result would not change: the Kerbawy Solicitation still would have a majority, if only barely.[150]

Defendants' strongest response to this point is that the harm to ACell of Bosley's breach goes beyond just the stock he owned, and impacted the validity of the entire Kerbawy Solicitation.  Specifically, Defendants point to Section 14(f) of the Separation Agreement, in which the parties agreed that any breaches thereof would result in harm that would be "difficult to measure" and for which money damages would be an "inadequate remedy."[151]  Thus, Defendants contend, "[b]y actively concealing Bosley's breach of the Separation Agreement, DeFrancesco and Kerbawy deprived ACell of its available injunctive remedy."[152]  For the following reasons, I conclude that this argument does not provide a sufficient basis for setting aside the Consents.

---

[149]  *Id.*; *see also, e.g.*, EDWARD P. WELCH ET AL., FOLK ON THE DELAWARE GENERAL CORPORATION LAW (6th ed. 2015) [hereinafter "FOLK ON THE DGCL"] §§ 225.03-225.04.  While I may consider claims that the New Board "obtained the office through fraud, deceit, or breach of contract," I may do so "only for the limited purpose of determining the corporation's *de jure* directors and officers." *Genger v. TR Invs., LLC*, 26 A.3d 180, 200 (Del. 2011).

[150]  Pl.'s Opening Br. 24-26; Pl.'s Reply Br. 25.  As noted above, Defendants' briefing did not contest the issue of the numerical sufficiency of the Consents, and it was not addressed at argument.

[151]  JX 149 § 14(f).

[152]  Defs.' Opening Br. 62; *see also* Defs.' Reply Br. 45.

In the hypothetical case Defendants posit—where Bosley participated in a consent solicitation in breach of the Separation Agreement, and the Company found out and sought to enjoin him from such breaches before or while they were ongoing (*i.e.*, sought the "available injunctive remedy" Defendants complain that ACell was deprived of)—the Court would analyze whether ACell was entitled to preliminary injunctive relief by assessing whether it had "(1) a reasonable probability of success on the merits at a final hearing, (2) an imminent threat of irreparable injury, and (3) a balance of the equities that tips in favor of issuance of the requested relief."[153]  In such an analysis, the Court would have to weigh whether the harm to ACell of not invalidating a consent solicitation that was being advanced in part by Bosley's breach of the Separation Agreement outweighed the countervailing harm—*i.e.*, the frustration of the intent of stockholders who sought to replace the board by executing written consents.  That is the same equitable balancing I must conduct here.  To my mind, therefore, Defendants' argument—that not setting aside the Consents would be inequitable because ACell was deprived of the chance to seek an injunction in the hypothetical situation I described—begs the question.  Thus, that line of reasoning on its own does not support taking the extraordinary step of setting aside the Consents.  Instead, I must balance the equities in the face of Bosley's breaches based on the circumstances of this case.

---

[153]     *Nutzz.com, LLC v. Vertrue, Inc.*, 2005 WL 1653974, at *6 (Del. Ch. July 6, 2005) (internal citations omitted); *Concord Steel, Inc. v. Wilm. Steel Processing Co.*, 2008 WL 902406, at *3 (Del. Ch. Apr. 3, 2008).

In conducting that analysis, I have considered carefully the decision in *Agranoff v. Miller*,[154] the main case upon which Defendants rely. In that case, Chief Justice Strine, writing as Vice Chancellor, decided a Section 225 action in favor of the parties seeking to invalidate written consents purporting to remove sitting directors because the stockholder delivering the consents, "in conspiracy with two faithless fiduciaries," wrongfully obtained his shares.[155] In particular, the defendant, who had had no stockholdings or other association with the company, used confidential information provided to him by a self-interested director to secretly buy up a controlling stake in the closely held company, in contravention of a stockholders' agreement under which the company itself and then the other stockholders had rights of first refusal as to any sales of company stock. The Court held that the defendant, in conspiracy with two fiduciaries and a company consultant, usurped a corporate opportunity by depriving the company of the right to re-purchase its stock or to facilitate the purchase thereof by existing stockholders, and for that reason "should not 'benefit from [his] wrongful actions' by being permitted to vote those shares."[156]

There are several material distinctions between *Agranoff* and the situation here. For one thing, the equities in that case cut much more clearly in favor of the challengers to the consent solicitation. In *Agranoff*, fiduciaries self-interestedly enabled a stranger to

---

[154]    1999 WL 219650 (Del. Ch. Apr. 12, 1999), *aff'd*, 737 A.2d 530 (Del. 1999).

[155]    *Id*. at *1.

[156]    *Id*. at *21 (quoting *Yiannatsis v. Stephanis*, 653 A.2d 275, 279 (Del. 1995)).

51

the corporation to accumulate a controlling stake in secret, in violation of the corporation's and the stockholders' rights of first refusal, and apparently without paying a control premium. Here, one fiduciary (DeFrancesco) and one former fiduciary (Bosley), who was acting in breach of an agreement with the Company, provided limited assistance to a stockholder who sought and obtained a majority of consents to replace the Board with a majority of new, independent directors. The agreement at issue in *Agranoff* went to the core of the consent solicitation's validity, because, if not for the contractual breaches, the defendant there would not have owned stock at all, much less the controlling block he used to replace the board. This case involves a much more attenuated connection between the Board's removal and the alleged breaches of Bosley's Separation Agreement; the factual record suggests that, if Bosley had not helped Kerbawy at all, the Solicitation still would have succeeded.

More importantly, though, the contractual rights that Defendants seek to vindicate here are materially different than the rights the Court protected in *Agranoff*. There, setting aside the written consents furthered interests of the corporation and all its stockholders, *i.e.*, the possibility of enjoying a control premium rather than letting an outsider secretly acquire control, and the benefits of keeping the ownership among the original group of investors, who viewed themselves as a private partnership. In this case, the principal benefit that would accrue from setting aside the Consents is that the incumbent Board would remain in control of ACell. Taking into consideration all the facts of this case, and with the teachings of cases like *Agranoff* in mind, I conclude that the balance of the equities here does not support setting aside the Consents in order to

52

vindicate the Company's rights under the Separation Agreement. [157] Granting such relief would benefit primarily, if not solely, the incumbent Board, as opposed to the Company and its stockholders at large.

## C. Alleged Misuse of Company Information

Defendants also argue that, in violation of his duty of loyalty, DeFrancesco provided Kerbawy with confidential Company information. As discussed above, there is no real dispute that at least some documents and information that DeFrancesco and Bosley provided Kerbawy contained ACell information to which he otherwise would not have had access. Furthermore, DeFrancesco and Kerbawy probably were negligent, and arguably might have been grossly negligent, in failing to take basic precautions such as requiring the recipients of the information to execute non-disclosure agreements.[158] That

---

[157] This conclusion finds support in then-Vice Chancellor Strine's reasoning in an earlier opinion in the *Agranoff* case, where he observed that: "[T]he proper way ultimately to address this situation may be to analyze whether there exists, on an objective basis, a valid corporate or shareholder interest that will be served by the enforcement of the contract. If there is not, then regardless of the subjective good faith of the plaintiffs, the contract should not serve as a basis for depriving [the party delivering consents] of control because enforcement of the contract would not serve any valid interest of the corporation or its stockholders. Such a merits-based approach has the virtue of enabling directors to assert corporate contractual rights which might benefit the stockholders while ensuring that directors do not usurp corporate contractual rights simply to protect their incumbency." *Agranoff*, 734 A.2d at 1074.

[158] *See* Tr. 361, 364-66 (DeFrancesco). At least three of the Director Nominees previously might have been or currently might be affiliated with companies operating in the same industry as ACell. *Id.* at 361, 365. It would be difficult on this record, however, to go further and find that their actions in this regard constituted bad faith or disloyalty. In any event, based on the rest of my analysis of this aspect of Defendants' argument, I need not delve into that issue.

53

type of carelessness easily could have harmed ACell if sensitive information fell into the wrong hands, but Defendants presented no evidence that any such harm occurred here.

There are several problems, however, with Defendants' argument that I should set aside the Consents because of DeFrancesco's and Bosley's willingness to provide certain documents to Kerbawy in furtherance of his Solicitation. One problem is that, based on the evidence, the documents and information at issue were fairly unremarkable corporate documents, many, if not all, of which would have been available to Kerbawy or any other stockholder by using Section 220. This is not a case in which trade secrets or commercially valuable proprietary information was put at risk, nor is it like some of the cases Defendants rely upon that involved disloyal disclosure by fiduciaries of business opportunities or other highly sensitive information.[159] A related problem is that, in the particular context of this privately held Company, the Board itself often shared with the stockholders information that it considered confidential or privileged, even during their efforts to dissuade stockholders from supporting Kerbawy's Solicitation.[160]

Most problematic for Defendants in this regard, however, is that they cannot point convincingly to any harm to ACell as a result of Kerbawy obtaining the Company

---

[159] *See, e.g.*, *Agranoff*, 1999 WL 219650, at *8-9, *19-21; *Shocking Techs., Inc. v. Michael*, 2012 WL 4482838, at *9 (Del. Ch. Oct. 1, 2012), *vacated on other grounds by Shocking Techs., Inc. v. Michael*, 2015 WL 3455210 (Del. Ch. May 29, 2015). The most troubling of the Company information that DeFrancesco disclosed to Kerbawy was contained in the Draft S-1 and the strategic planning document (JX 286). Even having considered those documents, however, I do not find this case to be analogous to either *Agranoff* or *Shocking Technologies* in terms of the confidential information at issue.

[160] *E.g.*, Tr. 176-79, 212-16 (Pfinsgraff); *id*. at 568-70 (McDonnell).

54

information and documents he did from DeFrancesco and Bosley. Attempting to demonstrate such harm, Defendants assert: that this "misuse of confidential information harmed the Company, as it allowed Kerbawy to keep the solicitation secret";[161] that DeFrancesco "misappropriated the information, in a manner that deprived the Company of its ability to enforce its rights under Section 220 and Bosley's Separation Agreement";[162] and that it was wrong for DeFrancesco "to use his office as a director to facilitate the solicitation in secret for his own personal interest without regard to the Company's interest."[163]

Each of these assertions is flawed. The first is the easiest to reject: neither the Company nor the incumbent Board has any right to prevent a stockholder from engaging in "secret" solicitation of written consents.[164] As to Defendants' second assertion, I find it unpersuasive as to both Section 220 and the Separation Agreement. I already have discussed the Separation Agreement *supra*. The suggestion that Kerbawy's "secret" Solicitation violated rights of *ACell* under Section 220 misconstrues the statute. Section 220 is designed to give stockholders rights to inspect corporate books and records, not to

---

[161] Defs.' Reply Br. 23; *see also* Defs.' Opening Br. 42.

[162] Defs.' Reply Br. 24.

[163] *Id*. at 26.

[164] "[Section 228(a)] creates a right in shareholders to act independently of the directors upon whom they may be dependent to call a meeting. Under Section 228, unless the charter otherwise provides, shareholders may act by written consent, without notice, a meeting and or a vote." *Prime Computer, Inc. v. Allen*, 1988 WL 5277, at *4 (Del. Ch. Jan. 22, 1988), *aff'd*, 540 A.2d 417 (Del. 1988).

55

serve as a kind of early-warning system for an incumbent Board to gird itself against consent solicitations.[165]

Defendants' contention that DeFrancesco improperly placed his own interests above ACell's when he provided Kerbawy with inside information comes closest to providing an equitable ground to find the Consents invalid. As a legal matter, the proposition Defendants cite in this regard, that "[i]nherent in the duty of loyalty is an obligation to protect the corporation by maintaining the confidentiality of its sensitive information,"[166] seems indisputable. As a factual matter, however, the record does not support their assertion that DeFrancesco was favoring his own interests over ACell's.

For starters, as ACell's largest stockholder, DeFrancesco's "interest" is closely aligned with ACell's: if the Company is destroyed or harmed materially by the New Board's approach to the DOJ Investigation, or for some other business reason, DeFrancesco stands to lose his more than $3 million investment. He is more motivated than any other individual to see that the Company succeeds with an IPO in the $500 million range or greater. Furthermore, in the immediate context of the Kerbawy

---

[165] *See* 8 *Del. C.* 220(b) ("*Any stockholder*, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose, and to make copies and extracts from: (1) The corporation's stock ledger, a list of its stockholders, and its other books and records . . . .") (emphasis added). Defendants cite no authority for the proposition that ACell might have rights under Section 220 in this situation.

[166] J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 BUS. LAW 33, 52 (2015); *see also Shocking Techs., Inc.*, 2012 WL 4482838, at *9.

Solicitation, DeFrancesco stands to *lose* his current Board seat, not gain more control.

Defendants insinuate at various points in their argument that DeFrancesco will benefit if the New Board determines to grant him advancement of the legal costs he personally is incurring or is likely to incur in connection with the DOJ Investigation. If a company has a permissive advancement regime, as ACell does here,[167] there conceivably will be situations where the board has to decide whether to advance funds. But, that is an issue for another day.

## D. The Fairness of the Kerbawy Solicitation Generally

In sum, the facts of this case do not provide sufficient justification for this Court to take the extraordinary step of setting aside the written consents executed by a majority of ACell's stockholders. In addition to the contentions I have addressed *supra*, a persistent theme running through Defendants' argument was that the Kerbawy Solicitation was not fundamentally fair. In particular, Defendants fall back on the argument that they possess superior knowledge related to the DOJ Investigation and believe themselves to be pursuing the course of action that will lead to the best resolution of that issue for ACell and its stockholders. They also complain that the Kerbawy Solicitation was sprung on the Board without giving it enough time to respond and give stockholders its side of the argument. On that basis, Defendants contend that I should set aside the Consents and

---

[167]     JX 1 art. V, § 5.

allow for a new vote—which Defendants suggest would come soon in the form of the Company's annual meeting—that can be based on "full and fair information."[168]

Based on the record, and as already discussed, I do not doubt the Incumbent Board believed that they would manage the Company better than the New Board. But in the context of a consent solicitation under Section 228, the Board is not entitled to a full and fair debate. The DGCL and ACell's charter clearly enable ACell's stockholders to act by written consent, *without notice*. Section 228 "creates a right in shareholders to act independently of the directors upon whom they may be dependent to call a meeting."[169] Adopting the rule Defendants urge in this regard threatens to impinge upon that right. My inquiry in this case must be and was limited to ensuring the fairness of the consent solicitation not in the sense that Defendants use it here—*i.e.*, that both sides fairly were able to present their views to the ACell stockholders—but in the sense that there was not a breach of fiduciary duty, breach of contract, fraud, or other wrongdoing that so "inequitably tainted the election" that the Court must intervene.[170] For the reasons I have discussed, I conclude that Defendants failed to carry their burden of showing such an inequitable circumstance in the facts of this case. I decline to go beyond that and delve into the merits of the decisions that Delaware law allocates to ACell's stockholders to make.

---

[168]  Defs.' Reply Br. 5. *See also id.* at 46-49; Defs.' Opening Br. 5, 62-65.

[169]  *Prime Computer, Inc. v. Allen*, 1988 WL 5277, at *4 (Del. Ch. Jan. 22, 1988), *aff'd*, 540 A.2d 417 (Del. 1988).

[170]  *Portnoy*, 940 A.2d at 72.

58

## IV. CONCLUSION

For the foregoing reasons, Plaintiff is entitled to a declaratory judgment as to his claim under Section 225 that the New Board validly was elected as of March 10, 2015. The Defendants' counterclaims and third-party claims against Kerbawy and DeFrancesco are dismissed. An implementing order accompanies this Opinion.